# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3787 | **DATE** | 5/29/2003 |
| **CASE TITLE** | PREMIER NETWORKS, INC. vs. LUCENT TECHNOLOGY INC., ET AL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Motion (19-1) for summary judgment is denied. Motion (33-1) for summary judgment is granted. Summary judgment is entered in favor of defendants Lucent Technology, Inc. and AT & T Corporation.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUN 0 5 2003 | |
| ✓ | Docketing to mail notices. | date docketed | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 64 |
| DW | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT CLERK

03 JUN -4 PM 6:51

FILED 03-03-10

Date/time received in central Clerk's Office

mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Premier Networks, Inc.,

    Plaintiff,

        v.

Lucent Technology Inc., et al.,

    Defendants.

No. 99 C 3787
Judge James B. Zagel



DOCKETED
JUN 0 5 2003

## MEMORANDUM OPINION AND ORDER

This case is before me on the parties' cross motions for summary judgment. Premier

Networks, Inc. ("PNI") moves for summary judgment of literal infringement of Claim 1 of its

U.S. Patent No. 4,303,805 (the "'805 Patent"), alleging that Lucent Technologies, Inc. and

AT&T Corp. (together, "Lucent") made and sold telephones that literally infringed Claim 1 of

the '805 Patent. Lucent moves for summary judgment of non-infringement.

**The '805 Patent**

Claim 1 of the '805 Patent reads (with my emphasis):

- An improved telephone subscriber station network,

- said network comprising telephone lines for connecting the subscriber station to

  other subscriber stations,

- said telephone lines comprising at least two lines having a D.C. potential there

  between, receiver means for receiving communication signals from said lines,

- transmitter means for transmitting communication signals over said lines,

49

- first solid state electronic means *coupling* said transmitter means and said receiver means to said telephone lines while *automatically compensating* for losses on said telephone lines,

- second solid state electronic means *coupling* said receiver means to said telephone lines *through* said first solid state electronic means,

- second solid state electronic means *operating in conjunction* with said first solid state electronic means for adjusting the sidetone in said receiver means and for adjusting the level of the communications signals received from the telephone lines by the receiver means, and

- said improved subscriber station network using on-inductive components for the compensation.

**Legal Standard**

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).* Summary judgment is as appropriate in a patent case as in any other. *Kegel Co., Inc. v. AMF Bowling, Inc., 127 F.3d 1420, 1425 (Fed. Cir. 1997); Serrano v. Telular Corp., 111 F.3d 1578, 1581 (Fed. Cir. 1997).* This is true especially with respect to issues regarding the proper scope of patent claims because "the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995).*

The determination whether a patent claim has been infringed is a two-step analysis. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process. *Id. at 976; Wolverine, 38 F.3d at 1196.* I restate here the horn book law to give context to the decision.

**Claim Construction**

The first step, claim construction, is a question of law and, as such, is made exclusively by the Court and involves ascertaining the true meaning and scope of each claim. *Markman, 52 F.3d at 1387.* Claims are the metes and bounds of a patent and must be interpreted in light of the claim language and specifications, the prosecution history, the other claims in the patent, the prior art, and the interpretation that those skilled in the art would give the claim. Courts cannot narrow or broaden the scope of a claim to give the patentee something different than what he has set forth.

Claims are read in light of the specifications. Ultimately, however, the claim measures the invention since claims are infringed, not specifications. Courts cannot read into a claim a limitation that appears only in the specifications, but not in the claims. Nevertheless, for claim interpretation purposes, the description in the specification can act as a sort of dictionary explaining the invention and defining terms used in the claims. *Markman, 52 F.3d at 979.*

Claims are also read in light of the prosecution history. The prosecution history of the patent consists of the entire record of proceedings in the Patent and Trademark Office (the "PTO"). This includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant. Such representations include amendments to the claims and

3

arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness. A particular construction "may be confirmed by what the patentee said when [] making [the] application," *Id. at 980*, but the prosecution history may not be used to "enlarge, diminish or vary" the limitations in the claims. Id.

A means-plus-function limitation permits a patentee to express an element in a combination claim as a means for performing a function, without reciting a structure, material, or act which performs the specified function. *Valmont Industries, Inc. v. Reinke Mfg. Co., Inc., 983 F.2d 1039, 1042 (Fed. Cir. 1993).* Section 112, ¶ 6 of the Patent Act provides explicit guidance for interpretation of claim elements expressed in means-plus-function terms. *35 U.S.C. §112, ¶ 6; Valmont, 983 F.2d at 1041.* Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

In addition to reciting the means for performing a function in the patent claim, a patentee must describe in the patent specifications some structure that performs the specified function. *Id. at 1042.* A court must then construe the functional claim language "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *35 U.S.C. §112, ¶ 6.*

**Infringement**

The second step, the infringement analysis, analyzes whether a claim covers an accused device, which is a question of fact. *Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575,*

4

*1582 (Fed. Cir 1995).* "Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1121 (Fed. Cir. 1985).* The patentee bears the burden of proving that every limitation set forth in the asserted claim is found in the accused product either literally or by the doctrine of equivalents. *Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994).*

Literal patent infringement, which is alleged here, is found if the accused device embodies every limitation of the claim, either literally or by an equivalent. *Litton Sys. v. Honeywell, Inc., 140 F.3d 1449, 1454 (Fed. Cir. 1998).* "If an express claim limitation is absent from the accused product, there can be no literal infringement as a matter of law." *Wolverine, 38 F.3d at 1199.* For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precludes a finding of infringement. *Lantech Inc. v. Keip Mach. Co., 32 F.3d 542, 547 (Fed. Cir. 1994).*

Literal infringement of a means-plus-function claim exists only when the accused device performs the identical function claimed in the patent and incorporates the structure disclosed in the specification or its substantial equivalent, as the means for performing that function. *Acromed Corp. v. Sofamor Danek Group, Inc., 253 F.3d 1371, 1378 (Fed. Cir. 2001).* Equivalency under Section 112, ¶ 6 differs from the doctrine of equivalents. *Valmont, 983 F.2d at 1043.* Under Section 112, "an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification."

5

*Id.* A determination of Section 112 equivalence does not involve the equitable tripartite test of the doctrine of equivalents. Id. Rather, under Section 112 "the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function." *D.M.I., 755 F.2d at 1575.*

If the required function is not performed exactly in the accused device, then Section 112 equivalency is not involved. *Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed Cir. 1987).* "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Id.* (emphasis in original).

**Means-Plus-Function Analysis**

After all the briefs have been submitted on the cross-motions for summary judgment, only two issues remain and were argued at the hearing before me – coupling and compensation. That is, the specific areas of controversy are the highlighted portions of Claim 1 of the '805 Patent as set forth below:

> . . . first solid state electronic means coupling said transmitter means and said receiver means to said telephone lines while automatically compensating for losses on said telephone lines,
>
> second solid state electronic means coupling said receiver means to said telephone lines through said first solid state electronic means,
>
> second solid state electronic means operating in conjunction with said first solid state electronic means for adjusting the sidetone in said receiver means and for

adjusting the level of the communications signals received from the telephone
lines by the receiver means . . .

The first two of these paragraphs set forth limitations of a "first" and "second solid state

electronic means." The third paragraph defines the structural relationship between those two

"means" clauses.

I turn first to whether the "first" and "second solid state means" of Claim 1 are means-

plus-function limitations. I find that they are and therefore must be limited under Section 112, ¶

6 to the structure shown in the '805 Patent and its equivalents. The Federal Circuit has found

that use of the word "means' in a patent claim raises the presumption that the patentee has

purposely chosen to invoke Section 112, ¶ 6. *Kemco, at 1361*.

To rebut this presumption and to fall outside of the strictures of Section 112, ¶ 6, PNI

would have to show that these claim elements recite sufficient, definite structure for performing

the stated function. *Cole v. Kimberly-Clark Corp., 102 F.3d 524 (Fed. Cir. 1996)* (holding that

the "perforation means" for tearing described a specific, sufficiently definite structure that

inherently supported the function and therefore was not governed by Section 112, ¶ 6). PNI's

definition of "solid state elements" is insufficient to rebut that presumption.

The term "solid state electronic" lacks a definite, specific and precise structural character

capable of performing the claimed functions of the '805 Patent. PNI's expert, Dr. David

Hughes, claims that "solid state" is synonymous with the term "semiconductor." More

persuasive, however, is Lucent's expert, Dr. Laurence Nagel, who testified that "semiconductor"

refers to the material of the device and connotes a broad range of materials with certain

conductive properties. (Declaration of Laurence Nagel, 62).

Each party's expert engages in a battle of the dictionaries in their attempts to offer a

definition of "solid state." First, Dr. Hughes relies on a non-technical dictionary. Dr. Nagel

counters with a dictionary from the field of solid state physics. Dr. Hughes argues that solid

state physics is a technological field much broader than electronic componentry and offers his

opinion that the Modern Dictionary of Electronics offers a more appropriate definition of "solid

state" in this context. Supplemental Declaration of David W. Hughes, 15. The Modern

Dictionary of Electronics' definition of "solid state" cited by Dr. Hughes is "[a]n adjective used

to describe a device such as a semiconductor, transistor or diode." *Id.*

PNI's own expert and Dr. Hughes' preferred dictionary definition of "solid state,"

however, do not persuade me that the term semiconductor does anything more than connote a

broad range of materials with semiconductor properties. In particular, the term "such as" in Dr.

Hughes' preferred dictionary definition makes it clear that semiconductor devices are only one

of a number of types of solid state devices.

**Equivalence Analysis**

Having determined that the "first" and "second solid state means" of Claim 1 are means-

plus-function limitations, I turn now to an examination of whether the "the single means in the

accused device which performs the function stated in the claim is the same as or an equivalent of

the corresponding structure described in the patentee's specification as performing that function."

*D.M.I., 755 F.2d at 1575.* An accused device will not be found to infringe a means-plus-

function claim if it does not perform the claimed function identically. *Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268-69 (Fed. Cir. 1999).*

To be considered infringing, the accused product must perform the functions exactly and functions must be performed by the means shown in the specification or the equivalents. The "coupling" and "coupling . . . through" limitations of Claim 1 require a specific relationship between the "first' and "second solid state means." Specifically, the transmitter and receiver must both be coupled to the telephone line by a common linking element. I find that Lucent does not infringe Claim 1 because the transmitters and receivers of Lucent's telephones are not coupled to the telephone lines by the required linking element.

As in the discussion of the definition of "solid state," there was significant disagreement among the experts early on as to how to measure and test the "automatic compensation" of the Lucent telephones. But here again, by the standard described by one of PNI's own experts, Lucent's telephones cannot be considered to automatically compensate as required by Claim 1. Dr. J. Alvin Connelly acknowledged that there is "an acceptable level of variation" that would constitute automatic compensation, "probably the threshold of an average person's ability to detect a change in sound level." Connelly Deposition, 142, 15-19.

Accordingly, to infringe, the Lucent telephones must have a detectable meaningful amount of compensation, something that actually improves the characteristics of the telephone. The parties have referred to this as something beyond "parasitic leakage" and Dr. Connelly referred to an amount of a 10 percent or greater change in the currents or voltages. Reviewing the many tests – and retests – of the Lucent telephones and the testimony surrounding these tests,

9

none of the tests show that any of the phones has exhibited any change in currents or voltages above 10 percent. And, in the integrated circuit telephones, although there is some evidence that compensation may exist in the form of "automatic gain control" but it is a substantially different form of automatic compensation than that taught in the '805 Patent.

Turning finally to the issue of "coupling." Again, each side conducted tests, retests and tests of each other's tests to get at the issue of whether the "first" and "second solid state means" in Lucent's telephones were "coupling," "coupling . . . through" or "operating in conjunction" such that Lucent's telephones infringe Claim 1. While there is disagreement about how to interpret the results of the tests, the experts agree at least on the theory of the experiment. If one of the solid state means, the transistor transmitter, were removed from the electronic circuit, and there were attenuation at the receiver, then there is an interrelationship between the two solid state means. In other words, there is "coupling," "coupling . . . through" or "operating in conjunction" and, therefore, infringement. If not, no infringement.

The experts found some attenuation at the receiver, which brings us back to the question of what weight, if any, we can give to the concept of "parasitic leakage." If we are to credit the idea that there must be more attenuation than that caused by mere "parasitic leakage," we are led to a more nuanced understanding of the theory of the experiment. That is, if the transistor transmitter were removed from the electronic circuit, and there were attenuation at the receiver greater than some acceptable or expected attenuation, then there is "coupling," "coupling . . . through" or "operating in conjunction" and, therefore, infringement.

10

Again, PNI's own words work against it. This time, those words are in PNI's response to the PTO's Final Office Action that discussed the use of solid state electronic means for coupling both the transmitting and receiver means as being anticipated by the Tabalba patent. Declaration of Richard M. Feustel, Jr., Exhibit 4. In its response, PNI distinguished its meaning of "coupling" in what became the '805 Patent from the prior art in Tabalba. Because Lucent's schematics track the Tabalba schematics, it necessarily follows that if PNI is sufficiently different from Tabalba then Lucent is sufficiently different from PNI. PNI can't have it both ways.

For the foregoing reasons, Premier Network, Inc.'s motion for summary judgment is DENIED, and Lucent Technologies, Inc. and AT&T Corp.'s motion for summary judgment is GRANTED.

ENTER:

James B. Zagel
United States District Judge

DATE: MAY 2 9 2003

11